## THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BARBARA ROLLINS,**<br>**individually and on behalf of herself**<br>**and all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **-vs-** | ) | **No.:**_____ |
| | ) | |
| **E.I. DU PONT DE NEMOURS AND**<br>**COMPANY,** | ) ) | **CLASS ACTION** |
| | ) | |
| **Defendant.** | ) | |

### COMPLAINT
### (Jury Trial demanded)

Plaintiff Barbara Rollins, on her own behalf and on behalf of all others similarly situated, by and through their undersigned counsel, hereby file this class action complaint Defendant, E.I. Du Pont de NEMOURS and COMPANY ("DUPONT") and allege as follows:

## I.    INTRODUCTION

1.    This is a class action seeking monetary and other relief on behalf of Plaintiff and a class of persons who acquired cookware coated with DUPONT's "Teflon®" product.  The case arises from DUPONT's deceptive and unfair trade practices in making false, misleading, deceptive and unconscionable representations and failing to disclose to the consuming public full and accurate information about the purported safety of Teflon®.  DUPONT knew or should have known, but failed to disclose to the consuming public, that cooking products manufactured with or containing

Teflon® can release harmful and dangerous substances, including a chemical that has been determined to be "likely" to cause cancer in humans, during the ordinary personal, family, household and commercial uses for which those products were acquired or retained.

2.      DUPONT designed, manufactured, sold and distributed Teflon® using these deceptive representations and omissions when it knew or should have known that Teflon® contains substances that may be dangerous and harmful to consumers that can be released when cooking products made with or containing Teflon® are used for their ordinary and foreseeable purposes.

3.      These actions are brought to redress DUPONT's unconscionable acts and practices, as further alleged below, and for

(i)      declaratory, injunctive and equitable relief on behalf of the Plaintiff Class Representative and the other Members of the Classes who are consumers and/or owners of cooking products containing DUPONT's Teflon® product;

(ii)      to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon®;

(iii)      to require that DUPONT cease and desist from the manufacturing, sale and distribution of cooking products containing Teflon®, which product causes the potential adverse and harmful effects complained of herein and/or compel DUPONT to stop making misstatements, misrepresentations, and/or omissions concerning the potential adverse and harmful effects of the use of cookware that is manufactured with or that contains Teflon®;

2

(iv)    to replace and/or exchange all existing Teflon® coated cookware products possessed by Class Members with non-hazardous cookware, or to compensate the class members with the cash equivalent thereof;

(v)    for equitable relief including rescission and restitution; and

(vi)    to require that DUPONT provide a warning label or other appropriate disclosure on cooking products made with or containing Teflon® regarding the potential adverse and harmful effects of cookware containing or manufactured with Teflon®.    These actions also seek damages on behalf of the Plaintiff Class Representatives and other Members of the Class.

## II.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over the actions pursuant to 28 U.S.C.A. § 1332(a)(1) and (d)(2) in that these actions seek relief with a monetary value in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees, and is between citizens of different States.

5.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Ponca City, State of Oklahoma.

6.    DUPONT is subject to jurisdiction of this court pursuant to Okla. Stat. § 12, § 2004(F), which provides "[a] court of this state may exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States."

3

### III.    CLASS REPRESENTATIVES

7.    Plaintiff, Barbara Rollins, is currently a resident of Kay County, State of Oklahoma.  Plaintiff at all times hereto, was a consumer of cooking products containing or made with DuPont's Teflon® product.

### IV.    DEFENDANT

8.    DUPONT is a Delaware corporation having a principal place of business at 1008 Market Street, Wilmingon, Delaware 19898.  DUPONT markets, sells or distributes Teflon® throughout the United States.  DUPONT

9.    DUPONT is in the business of manufacturing and supplying Teflon® for distribution, marketing, wholesaling and retailing in various products made for consumer use.  Included among these products are housewares, household appliances, and cooking products such as pots and pans.

### V.    BACKGROUND AND GENERAL ALLEGATIONS

10.    DUPONT was founded in 1802.

11.    DUPONT operates in more than seventy (70) countries.

12.    Teflon® was invented in 1938 at DUPONT's Jackson Laboratory.

13.    Teflon® is DUPONT's trademarked name for the chemical product called polytetrafluoroethylene (PTFE).

14.    DUPONT has registered the Teflon® trademark in nineteen (19) countries and first began selling Teflon® commercially in 1946.  The Teflon® product became a popular component of cookware in the 1960s.

15.    As DUPONT proudly boasts in its Teflon® website:

4

> Teflon® is really everywhere.  Not only can you find it in
> your clothes and on your cookware, but you can also find it
> on products on almost every continent.

16.    According to DUPONT's Teflon® website:  "there have been billions of cookware products coated with Teflon® non-stick coating sold around the world over the past 40 years."

17.    DUPONT claims on its Teflon® website that "the Teflon® brand is one of the world's most recognized and respected" brands and has strong consumer recognition.

18.    Teflon® is commonly found in "non-stick" cooking products, such as in pots, pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

19.    Teflon® and the chemicals used in its production together represent a $2 billion per year industry.

20.    DUPONT nets an estimated $200 million per year from its sale of Teflon®.

21.    DUPONT has advertised and represented to the public that Teflon® makes life easy, and reportedly has called Teflon® a "housewife's best friend."

22.    DUPONT claims on its Teflon® website that "the Teflon® brand is one of the world's most recognized and respected of all ingredient brands" and that Teflon® enhances consumer recognition.

23.    DUPONT's scientists have studied whether products containing Teflon® are safe for use by consumers.  DUPONT has continually represented to consumers in public statements and documents, in press releases, and on its websites that Teflon® is

safe for consumer use and has denied that the use of cookware coated with its Teflon® product can be harmful to human health.

24.     DUPONT's Teflon® website is replete with statements touting the safety of Teflon® coated cookware, such as "cookware made with Teflon® non-stick coating is totally safe for everyday use."

25.     DUPONT has backed such claims with boasts, such as the following, of its decades of quality assurance and testing work concerning cookware that is coated with its Teflon® product:

> DUPONT certification seal means you can trust cookware to meet the toughest DUPONT standards for quality and performance. Standards are upheld by a unique 13-point checklist for quality assurance. Plus, DUPONT tests cookware in a rigorous battery of real-world tests, including over 30 years of in-home kitchen testing and an ongoing program of professional chef testing conducted in commercial restaurants.

26.     In addition, DUPONT has represented to consumers that it retains oversight and control of the use of its Teflon® product by licensees who wish to combine it with their cookware products.  For example,

> Before a manufacturer is licensed to use a DUPONT non-stick coating, they must submit their products to DUPONT to make certain that exacting quality standards are met. Once a manufacturer is licensed, DUPONT conducts periodic testing to ensure that those standards are consistently upheld.  Finally, each manufacturer conducts in-house tests against their own quality standards.

27.     DUPONT has continually represented to consumers in public statements, advertisements and other writings, in press releases, and on its websites, that there is no danger or risk posed by using cooking products coated with Teflon®, and has denied that

the normal and customary use of cooking products coated with Teflon® presents any human health risks.

28.    Perflourooctanoic acid ("PFOA") is a perflourinated detergent/surfactant that is manufactured, processed, and/or distributed by DUPONT in connection with its manufacture of Teflon®. PFOA is also sometimes referred to by DUPONT as C-8.

29.    PFOA is the chemical used to give Teflon® its "non-stickiness."

30.    PFOA is a synthetic chemical that does not occur naturally in the environment.

31.    PFOA is a liver toxin in animals, is biopersistent in humans and animals, and bioaccumulative in humans.

32.    PFOA is associated with other health concerns in animals, including cancer and developmental defects.

33.    PFOA is not naturally occurring but is nonetheless found to contaminate the blood of humans in all geographic regions of the United States.

34.    For example, a study released in 2001 by 3M Corporation found that PFOA was present in the blood of 96% of the 598 children tested. The children were located in 23 states.

35.    Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

36.    DUPONT has conducted both animal and human studies and tests on PFOA.

37.    In 1981, 3M, a manufacturer of PFOA, advised DUPONT that PFOA may cause birth defects in laboratory animals.

38.    Also in 1981, DUPONT possessed a document describing the results of a blood sampling study DUPONT conducted on eight (8) employees who were either pregnant or who had recently given birth.   This study was done at the plant where Teflon® was manufactured.  This document identified the levels of PFOA in the blood of DUPONT's employees and described the status of the child/fetus.

39.    A purpose of DUPONT's blood sample study was to evaluate these pregnant employees for PFOA exposure, and to monitor umbilical cord blood for the presence of PFOA, to test the babies' blood for the presence of PFOA, and to assess reproductive outcome of these employees exposed to PFOA, including any birth defects.

40.    The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DUPONT employees and in the blood of another worker's baby.  Thus, DUPONT knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

41.    In 1982, DUPONT reported data to the EPA regarding the transplacental movement of PFOA in rats.   The EPA considered this information to be "substantial risk data."  DUPONT failed to disclose to the EPA (or to consumers), however, that it had obtained human blood sampling data in 1982 that confirmed the transplacental movement of PFOA in humans, and further failed to disclose to the EPA the information it had about the occurrence of birth defects in the babies of its female workers exposed to PFOA.

42.    Upon disclosure of this additional information, the EPA found that DUPONT's human blood sampling data demonstrating the transplacental movement of

8

PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

43.    More specifically, the EPA contends that DUPONT's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

44.    The EPA considers DUPONT's human blood sampling study confirming transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

45.    Moreover, the EPA considers DUPONT's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA of which DUPONT was aware.

46.    Additionally, documents maintained by DUPONT chronicling the health effects of babies born to DUPONT workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies.

47.    Among other things, as a result of DUPONT's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DUPONT's concealment of its study information and determined that DUPONT engaged in unlawful behavior by concealing the blood sample study results.

48.    DUPONT's concealment of its 1981 blood sample study information protected the continued marketability of Teflon® and the profits received by DUPONT from its sale of Teflon®. As the EPA pointedly stated in its complaint against DUPONT

contending that DUPONT violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DUPONT when DUPONT obtained the information in 1981.

49.    DUPONT has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act by paying the largest civil administrative fine the EPA has ever obtained under any federal environmental statute.

50.    After DUPONT's settlement with the EPA, DUPONT ran full-page advertisements in many major national newspapers in early February 2006 promoting non-stick cookware as "safe" and saying "there is no reason to stop using it."

51.    As of April 24, 2006, DUPONT's Frequently Asked Question section of its website continues to deny any concerns over the safety of the Teflon® product:

> Q:    Can I get exposed to PFOA from cookware?
>
> A:    Using the testing methods developed and approved by the U. S. Food and Drug Administration (FDA), DUPONT has concluded that consumers cannot be exposed to PFOA through cookware coated with Teflon® non-stick finishes.
>
> Q:    How safe is my cookware?
>
> A:    Confidence in the safety and performance of DUPONT non-stick coatings on cookware and housewares is based on more than 25 years of laboratory and use testing worldwide. Prior to market introduction, DUPONT non-stick coatings were subjected to exhaustive studies at the Haskell Laboratory for Toxicology and Industrial Medicine. The U.S. Food and Drug Administration (FDA) has found them acceptable for conventional kitchen use. In addition, other health regulatory agencies throughout the world have approved the use of DUPONT non-stick

coatings on cookware and housewares. To date, cooks in more than 40 countries around the world have purchased over 2 billion pots and pans with DUPONT non-stick coatings for home and commercial use. In all of this experience, there has been no record of serious or chronic, or acute health problems.

52.    As of April 25, 2006, DUPONT continued to deny the risks posed by the

Teflon® product to the consumers on its website:

> **Studies using FDA standard testing methods found no detectable level of PFOA in Teflon® non-stick cookware. A published, peer-reviewed study (April 2005) in Environmental Science and Technology [.pdf]** found no PFOA in Teflon® cookware. No PFOA was detected even when the cookware was scratched with a knife. Studies using FDA standard testing methods also found no detectable levels of PFOA in non-stick coatings used for cookware sold under the Teflon® brand. The Danish Technical Institute and Chins Academy of Inspection and Quarantine tested Teflon® cookware and id not detect PFOA.

> However, according to a recently published study conducted by researchers at the U.S. Food and Drug Administration (FDA), PFOA was detected in minute quantities in cookware using extreme and abusive test methods—methods that do not reflect what happens when consumers use cookware. The quantities of PFOA detected through these extreme measures were too small to measure migration of the PFOA out of the cookware. Published, peer-reviewed research clearly shows that cookware is safe for consumer use.

> **Consumers can use their cookware with complete confidence.**

> **Not all non-stick coatings are branded Teflon®.**

> Teflon® branded non-stick coatings are made solely by DUPONT. Teflon® is a registered trademark. Not all non-stick coatings are branded Teflon®. Moreover, a stringent certification program ensures that non-stick coatings by DUPONT are used only in suitable applications.

**All Teflon® branded products are safe for their intended consumer and commercial use.**

53.    In May 2005, however, a federal grand jury from the Justice Department's Environmental Crimes Section issued a subpoena to DUPONT regarding DUPONT's use of PFOA.

54.    There are numerous additional facts and studies of which DUPONT was aware demonstrating that exposure to PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage, and other negative health effects in tests on laboratory animals.  For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

55.    Various studies have confirmed that exposure to PFOA causes or may cause vascular disease.  For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota, demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease.  Findings of vascular disease have also been reported in a study of DUPONT workers exposed to PFOA.  Additionally, DUPONT's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA.  Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA.  Moreover, there are animal studies showing changes in blood chemistry associate with PFOA exposure that bolster these human study results.

56.    Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer.  For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality.  Moreover, an elevated risk of dying from prostate cancer was

found among certain workers exposed to PFOA. Additionally, workers at 3M's Decatur, Alabama, plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

57.    A recent study by Johns Hopkins University researchers found PFOA in the cord blood of 99% of newborn infants.

58.    The Environmental Protection Agency's ("EPA") website states: "[S]tudies have shown that PFOA exposure can result in a variety of toxic effects in animals including liver toxicity, developmental toxicity, and immunotoxicity."

59.    The EPA further states that "PFOA is persistent in the environment. It will continue to accumulate as long as it is produced."

60.    There are numerous other studies demonstrating many potential health risks related to exposure to PFOA. Some of these studies include:

(a)    Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DUPONT's Washington Works plant from 1956-1989. Additionally, a general mortality study found an increase in leukemia.

(b)    Workers exposed to perfluorochemicals at 3M's Decatur, Alabama, plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally. An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota, plant compared to the general population.

(c)    At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

(d)    At 3M's Cottage Grove, Minnesota, plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

(e)    A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

(f)    There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

61.    There is evidence that PFOA causes birth defects in animals, especially eye defects.

62.    Rats and mice exposed to PFOA frequently develop tumors of the reproductive organs, liver and pancreas.

63.    A study by DUPONT in early 2005 that examined 1,000 employees from its Washington Works facility in West Virginia found a 10% increase in total cholesterol in workers with high concentrations PFOA in their blood. The cholesterol increase came primarily from an increase in LDL cholesterol, while HDL level remain unchanged.

64.    Similar results had been observed in a longitudinal study of Italian workers exposed to PFOA. *See* Report by Giovanni Costa describing a meeting with 3M and DUPONT, August 23, 2004.

65.    Other evidence of the health effects of PFOA includes a study by 3M that showed that workers present during the manufacture of Teflon® products faced a chance

of dying of stroke that was fifteen times the risk faced by unexposed workers. This suggests that PFOA exposure contributes to vascular disease. *See* "Mortality study of workers employed at the 3M Cottage Grove Facility. Final Report." Division of Environmental and Occupational Health, School of Public Health, University of Minnesota Alexander, B. 2001. AR 226-1136. Washington, D.C., U.S. Environmental Protection Agency.

66.    Over 40 years ago, DUPONT conducted human experiments with Teflon®-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon®-related illness commonly called Polymer Fume Fever. DUPONT laced the cigarettes of its volunteers with Teflon® and had the volunteers inhale the cigarette fumes until they became sick. In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of nine hours, demonstrating flu-like symptoms, including chills, backache, fever, and coughing. These symptoms are commonly linked to Polymer Fume Fever. DUPONT acknowledges that Teflon® fumes can sicken people, causing Polymer Fume Fever.

67.    Moreover, apparently aware of the adverse effects to humans from inhaling heated particulates and/or fumes emitted by Teflon®, DUPONT required its employees to wear respirators when working with Teflon® heated to 400°F (or more) while in poorly ventilated areas. Experiments demonstrate that when cooking in the home, the surface of a Teflon® coated pan can reach this temperature within two minutes using a conventional stovetop burner set on high.

68.    Reports indicate that a Teflon® coated pan reached 721°F in just five minutes under the same test. DUPONT studies show that Teflon® emits toxic

particulates at 446°F.  At 680°F Teflon® coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses.  At temperatures that DUPONT scientists claim are reached on stovetop drip pans (1000°F), non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWI lung-destroying gas warfare agent *phosgene*.

69.    For the past fifty years DUPONT has claimed that their Teflon® coatings do not emit hazardous chemicals through normal use.  In a recent press release, DUPONT wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660 degrees F (340 degrees C).  These temperatures alone are well above the normal cooking range."   Reported tests show, however, that Teflon® coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high.  The toxic particles and gases emitted when Teflon® heats and the temperatures at which these particles and gases are first emitted, follow:

464°F -- Ultrafine particulate matter:  Teflon® produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure.  Longer exposure causes death.

680°F – Tetrafluoroethylene (TFE):  The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcincogen because it is known to cause cancer in laboratory animals.

680°F – Hexafluoropropene (HFP):  Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death.  Long-term exposure is associated with decreased motor speed, memory and learning.   In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination.  HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680°F – Difluoroacetic acid (DFA):  Kidney toxicity from DFA has been reported in rats.

680°F – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic. Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision. If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680°F – Perfluorooctanoic acid (PFOA): the effects of PFOA are discussed throughout this Complaint.

878°F – Silicon tetrafluoride (SiF4): Silicon tetrafluoride is a highly toxic, corrosive gas. In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung. Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia), discoloration of the teeth and abnormal thickening of the bone.

878°F – Perfluoroisobutene (PFIB): Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound.* PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932°F – Carbonyl fluoride (COF2): Breakdown of Teflon® in the air is the major source of carbonyl fluoride exposure. Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent. Carbonyl fluoride fumes can irritate eyes, ears and nose. More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932°F – Hydrogen fluoride (HF): Hydrogen fluoride (HG) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112°F – Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112°F – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness

and death.    People with pre-existing heart conditions may be extra vulnerable.

70.    The EPA has recently identified significant human health concerns from exposure to PFOA.

71.    On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

72.    A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans.  The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' carcinogen in humans.**  According to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans. (emphasis added)

73.    On January 20, 2006, the Chair of the EPA Science Advisory Board and the Chair of the PFOA Risk Assessment Review Panel, EPA Science Advisory Board wrote to the Administrator of the EPA stating, in part, that:

> [t]he predominant SAB view was that the experimental weight of the evidence regarding the human carcinogenic potential of PFOA was more consistent with the [EPA's] description of 'likely to be carcinogenic' as described in the EPA Guidelines for Carcinogen Risk Assessment since laboratory studies in rats show that PFOA is a multi-site and multi-gender carcinogen.[1]

---

[1] The EPA's Guidelines for Carcinogen Risk Assessment applies the "likely to carcinogenic" description to compounds that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

74.    A recent study from the Centers for Disease Control shows that PFOA may have contaminated the bloodstream of fetuses throughout the United States.

75.    DUPONT at all times relevant did not disclose to consumers any of the preceding studies, tests, or data discussed herein.

76.    DUPONT at all times relevant did not issue warnings to cookware consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals found in Teflon®, as discussed herein.

77.    DUPONT at all times relevant did not instruct or require that its Teflon® licensees, who manufacture the cookware onto which DUPONT's Teflon® product is applied, issue warnings to cookware consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals found in Teflon®, as discussed herein.

78.    Instead, DUPONT has continually represented to consumers in public statements and documents, in press releases and on its websites that there is no danger posed by PFOA when using cookware coated with its Teflon® product and has denied that the use of Teflon® coated cookware can be harmful to human health.

79.    DUPONT executives continue to claim that the use of Teflon® in cooking products is completely safe.

80.    Further, in May 2005, a federal grand jury from the Justice department's Economic Crimes Section issued a subpoena to DUPONT regarding DUPONT's use of PFOA.

81.    While DUPONT and industry scientists have studied the possible health risks associated with the manufacture and use of the Teflon® product since the

substance's introduction, the company publicly maintains that "Teflon® is Safe" and that the use of Teflon® non-stick cookware poses absolutely no risk to human health.

## VI.    CLASS ACTION ALLEGATIONS

82.    The Class Representatives seek declaratory, injunctive, and equitable relief on behalf of the Class and to adjudicate DUPONT's liability for its deceptive, unfair, and unconscionable representations and omissions.  The Class Representatives also seek rescission, restitution, and/or disgorgement remedies; the creation of a fund to further investigate the potential for adverse health effects resulting from consumer use of Teflon® coated cookware, to require DUPONT to cease and desist from making materially false or misleading statements regarding the potential adverse health effects associated with heated Teflon®, to require DUPONT to provide a warning label on all Teflon® coated cookware, for other forms of equitable and injunctive relief, and damages.

83.    Class action treatment is appropriate pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(A) and (B) and 23(b)(2) and (b)(3), as necessary or appropriate.

84.    The Class Members are those who purchased or otherwise obtained ownership within Oklahoma, of one or more cooking products made with or containing Teflon® at any time during the previous three years beginning with the date on which this lawsuit was filed.  (SOL for consumer action is 3 years).

85.    The size of the Class is currently unknown but is in excess of millions of consumers and users of Teflon® coated cookware.

86.    Excluded from the Class is any presiding District Court Judge, as well as any appellate court judges that may review this case.

87.    DUPONT has knowledge of all licensees authorized to manufacture or sell cookware made with or containing Teflon® and the brand and model names so marketed. Upon information and belief, and subject to information obtainable only through pretrial discovery, DUPONT licensed the use of Teflon® to, among others, the following manufacturers and models of cookware:

| MFG. | MODELS |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Anolon | Anolon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven and Bake Liners |
| Circulon | Circulon Total<br>Elite<br>Premier<br>DUPONT Autograph<br>Circulon Electrics |
| Crestware | DUPONT Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DUPONT | Autograph<br>Platinum Pro<br>Platinum Select<br>Xtra<br>Classic |

| MFG. | MODELS |
|------|--------|
| Farberware | Farberware, Inc.<br>Farberware Millenium<br>Farberware Nonstick<br>Aluminum<br>Restaurant Pro<br>Enhanced Nonstick Cookware<br>Select<br>Vibrance<br>Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick<br>Bakeware |
| GAU | |
| GSI Outdoors | Bugaboo |
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware, Inc. of California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell Rubbermaid | Calphalon |
| Royal Cougar | |
| Salton | |
| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
| T-Fal | Jamie Oliver Cookware |
| US Foodservice | Next Day Gourmet |
| Wearever | Mirro<br>Regal<br>Wearever |

88.    The prospective Class Members are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

89.    There is a well-defined commonality of interest regarding the questions of law and fact that predominate over any questions possessed by affecting only individual Class Members and which make class certification appropriate.  Questions of law and fact common to the Class, among others, are:

a.    Whether DUPONT made, approved, allowed, or ratified representations, including those made through mass marketing and product-specific advertising that Teflon® or the use of Teflon® coated cooking products was safe, or healthful, or that use of Teflon® coated cooking products was more healthful than use of non- Teflon® coated cooking products.

b.    Whether DUPONT's mass marketing and product-specific advertising that Teflon® or the use of Teflon® coated cooking products was safe, healthful, or that use of Teflon® coated cooking products was more healthful than the use of non-Teflon® coated cooking products, would cause a reasonable person to believe the ordinary use of Teflon® coated cooking products entailed no potential human health risk.

c.    Whether at the time of such mass marketing and product-specific advertising, DUPONT possessed or relied upon a reasonable basis in fact (such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence) substantiating representations that Teflon® or the use of Teflon® coated cooking products was safe, healthful, and entailed no potential human health risks.

d.     Whether at the time of such mass marketing and product-specific advertising, DUPONT knew or should have known that the release of substances during the ordinary and foreseeable use of Teflon® coated cooking products could not medically or scientifically be said, to a reasonable degree of professional certainty, to entail no potential human health risks.

e.     Whether at the time of such mass marketing and product-specific advertising, DUPONT had in its possession animal or human test data indicating potential adverse health effects from exposure to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products.

f.     Whether at the time of such mass marketing and product-specific advertising, DUPONT had knowledge or possession of blood sample test results of its workers indicating transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products.

g.     Whether at the time of such mass marketing and product-specific advertising, DUPONT had in its possession data regarding deformities suffered by the children of female DUPONT employees exposed to one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products.

h.     Whether at the time of such mass marketing and product-specific advertising, DUPONT had in its possession information demonstrating or tending to demonstrate that one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products does present potential risk of injury to human health.

      i.      Whether during the time of such mass marketing and product-specific advertising, DUPONT had been notified by the EPA that evidence of transplacental movement of one or more of the chemicals that can be released during ordinary and foreseeable use of Teflon® coated cooking products in laboratory rats was "substantial risk data" of a potential human health risk.

      j.      Whether at the time of such mass marketing and product-specific advertising, DUPONT knew or should have known that fumes from heated Teflon® coated cooking products can sicken people.

      k.      Whether the representations in DUPONT's mass marketing and product specific advertising, that Teflon® or the use of Teflon® coated cooking products was safe, healthful, ore more healthful than use of non- Teflon® coated cooking products, were qualified or unqualified.

      l.      Whether at the time of such mass marketing and product-specific advertising, DUPONT disclosed, in a fashion sufficiently specific so as to leave no reasonable probability of misunderstanding, clearly, conspicuously and in close proximity to its affirmative representations, any and all material exclusions, reservations, limitations, modifications, or conditions relevant to the affirmative representations that Teflon® or the use of Teflon® coated cooking products was safe, healthful, ore more healthful than use of non- Teflon® coated cooking products.

      m.      Whether DUPONT's mass marketing and product-specific advertising affirmatively represented that Teflon® or the use of Teflon® coated cooking products was safe, healthful, or more healthful than the use of non- Teflon® coated cooking products, when DUPONT knew or should have known those representations

25

would justifiably induce class members to choose, retain, and/or continue the use of Teflon® coated cookware, or to refrain from choosing and using other cookware, due to DUPONT's failure to disclose – knowingly, with scienter, and/or through a failure to exercise reasonable care -- what it actually knew, and actually did not know, about the truth or falsity of those representations, thus, rendering those representations untrue, deceptive, or misleading, to the injury of class members.

      n.     Whether the Representatives' claims are sufficiently similar to the claims of prospective class members.

      o.     The types of equitable and injunctive relief to which the class members may be entitled for deceptive, misleading and fraudulent misrepresentations.

90.     These common questions of law and fact are governed by the laws of this state, where DUPONT has engaged in its wrongful conduct and which predominate over questions that affect only individual Class Members.

91.     The claims of the Class Representatives are typical of those of the Classes they represent. The Class Representatives are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them. The Class Representatives anticipate no difficulty in the management of this litigation as a class action. Accordingly, the Class Representatives are adequate representatives of the Classes they represent and will fairly and adequately protect the interests of the Classes.

92.     A class action is the best available method for the fair and efficient adjudication of this controversy. The Members of the Classes are so numerous that the joinder of all Members is impracticable, if not impossible. Because the harm suffered by

individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation makes it impractical for Class Members to seek redress individually for the wrongful conduct alleged herein.   Should each individual Class Member be required to bring a separate action, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and on the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interest of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

93.    To the extent such conditions exist, all conditions precedent to the maintenance of this action have been performed, have occurred, or have otherwise been satisfied or waived.

94.    Plaintiff, on her behalf and on behalf of the Classes she represents, has retained the undersigned counsel to represent them and have agreed to pay reasonable fees and costs for their services.

## VII.    CLAIMS FOR RELIEF

### COUNT I

### DECEPTIVE TRADE PRACTICES

95.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 94 above as if fully set forth herein.

96.    This claim is brought pursuant to Okla. Stat. 78, § 51 et seq., commonly referred to as the Oklahoma Deceptive Trade Practices Act.

97.    DUPONT is a "person" as defined in Okla. Stat. 78, § 52(8).

98.    DUPONT has engaged in deceptive trade practices by falsely representing the source, sponsorship, approval or certification of goods or services.  Okla. Stat. 78, § 53(A)(2).

99.    DUPONT has engaged in deceptive trade practices by falsely representing the characteristics, ingredients, uses, benefits or quantities of goods or services. Okla. Stat. 78, § 53(A)(5).

100.    DUPONT has engaged in deceptive trade practices by representing that goods or services are a particular standard, quality, or grade, or that goods are a particular style or model, if they are another. Okla. Stat. 78, § 53(A)(7).

101.    DUPONT knew or should have known that Teflon® emissions from heating were and are potentially harmful and hazardous to consumers, impose a risk to human health given the medical and scientific evidence within DUPONT's knowledge, and are not without risks to human health for all uses or conditions associated with the use of Teflon® coated cooking products.

102.    DUPONT knew or should have known that products containing Teflon® were or are potentially harmful to the Plaintiff.

103.    DUPONT engaged in deceptive trade practices by falsely representing that products containing Teflon® were safe for use by consumers and their families.

104.    DUPONT engaged in deceptive trade practice in that it knew or should have known that exposure to PFOA has caused injuries to humans and animals but concealed its knowledge of the potential dangers associated with the use of Teflon® from the public and from the EPA in order to deceive customers into using and purchasing products containing Teflon®.

28

105. DUPONT has engaged in deceptive trade practices by repeatedly stating that both Teflon® and PFOA are innocuous and safe substances, notwithstanding its knowledge of tests and other facts that demonstrate, and tend to demonstrate, otherwise.

106. DUPONT has engaged in deceptive trade practices by failing to adequately disclose the foregoing facts to the consuming public.

107. As a direct and proximate result of the foregoing, the Class Representative Plaintiff and other Class Members have been damaged.

## COUNT II

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT

108. Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 107 above as if fully set forth herein.

109. This claim is brought pursuant to Okla. Stat. 15, § 751 et. seq., commonly referred to as the Oklahoma Consumer Protection Act.

110. DUPONT is a "person" as defined in Okla. Stat. 15, § 752(1).

111. The advertising, offering for sale or purchase, sale, purchase, and distribution of Teflon®, constitutes a "consumer transaction" as defined in Okla. Stat. 15 § 752(2).

112. DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by making a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction. Okla. Stat. 15, § 753(2).

113.    DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by making a false representation, knowingly or with reason to know, as to affiliation, connection, association with, or certification by another. Okla. Stat. 15, § 753(3).

114.    DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by making a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction, or false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith. Okla. Stat. 15, § 753(5).

115.    DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by representing, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style, or model, if it is another. Okla. Stat. 15, § 753(7).

116.    DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by committing a "deceptive trade practice" as defined in Okla. Stat. 15, § 752, in that DUPONT made a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead the Plaintiff and the Class Members to their detriment. Okla. Stat., 15 § 753(20).

117.    DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by committing an "unfair trade practice" as defined in Okla. Stat. 15, § 752, in that its practices offend established public policy or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Okla. Stat., 15 § 753(20).

118.    DUPONT has engaged in an unlawful practice under the Oklahoma Consumer Protection Act by falsely stating or implying that any person, product or service is recommended or endorsed by a named third person. Okla. Stat. 15, § 753(29).

119.    DUPONT knew or should have known that Teflon® emissions from heating were and are potentially harmful and hazardous to consumers, impose a risk to human health given the medical and scientific evidence within DUPONT's knowledge, and are not without risks to human health for all uses or conditions associated with the use of Teflon® coated cooking products.

120.    DUPONT knew or should have known that products containing Teflon® were or are potentially harmful to the Plaintiff.

121.    In violation of Oklahoma's Consumer Protection Act, DUPONT failed to disclose to the Plaintiff and concealed from her the information it knew of relating to the adverse effects of chemicals contained in and released by Teflon® as demonstrated in animal studies, the blood sample data it compiled regarding transplacental movement of chemicals contained in Teflon® and the information it knew of regarding the occurrence of birth defects in the children of its female workers.

122.    In violation of Oklahoma's Consumer Protection Act, DUPONT falsely representing that products containing Teflon® were safe for use by consumers and their families.

123.    DUPONT knew or should have known that exposure to PFOA has caused injuries to humans and animals but concealed its knowledge of the potential dangers associated with the use of Teflon® from the public and from the EPA in order to deceive

customers into using and purchasing products containing Teflon®, in violation of Oklahoma's Consumer Protection Act.

124.    DUPONT has violated Oklahoma's Consumer Protection Act by repeatedly stating that both Teflon® and PFOA are innocuous and safe substances, notwithstanding its knowledge of tests and other facts that demonstrate, and tend to demonstrate, otherwise.

125.    DUPONT has failed to adequately disclose the foregoing facts to the consuming public.

126.    As a direct and proximate result of the foregoing, the Class Representative Plaintiff and other Class Members have been damaged.

## COUNT III

### UNJUST ENRICHMENT

127.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 126 above as if fully set forth herein.

128.    DUPONT knew or should have known of the potential risks associated with Teflon® coated cooking products as further alleged above but failed to disclose such facts to the Plaintiff and to the Class Members.

129.    Plaintiff and the Class Members purchased cooking products made with or containing Teflon® without fully understanding the risks and hazards associated with the use of Teflon® coated cooking products, which rendered the cooking products unfit for their intended purpose.

130.    Upon information and belief, DUPONT concealed the potential risks associated with the use of Teflon® coated cooking products in order to reap the substantial monetary benefit from the Plaintiff and the Class Members.

131.    As a result of their purchases, Plaintiff and the Class Members conferred a substantial monetary benefit on DUPONT.

132.    DUPONT knew of, appreciated, accepted and retained the monetary benefit conferred upon it resulting from the Plaintiff's and the Class Members' purchases of Teflon® coated cooking products.

133.    By virtue of the foregoing, DUPONT was unjustly enriched at the Plaintiffs' and Class Members' expense.

134.    Under the circumstances, in good conscience and equity, DUPONT should not be permitted to retain the substantial monetary benefit conferred upon it by the Plaintiff and the Class Members.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## UNDER OKLA. STAT. 12A, § 2-314

135.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 134 above as if fully set forth herein.

136.    As a manufacturer and seller of the Teflon® product, DUPONT, as a matter of law, warranted that its Teflon® products are merchantable and fit for the ordinary purpose for which such goods are used.

137.    As alleged herein, one or more defects or unreasonably dangerous conditions existed at the time the Teflon® products left the Defendants' hands so that the Teflon® was not reasonably suitable for its ordinary uses, i.e., as a safe cookware coating, for which goods of that kind were sold. Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to potentially toxic and harmful chemicals, particulates and gases. These defective and dangerous characteristics distinguish Teflon® from other products intended to be used as a cookware coating.

138.    In addition, DUPONT failed to provide Plaintiff and the Class Members with an adequate warning regarding this Teflon® product, i.e., one that would have allowed Teflon®'s users to balance its risks of harm against its social utility as a cookware coating.

139.    Plaintiff and the Class Members have purchased cookware containing the Teflon® product as a cooking surface coating for use in a manner that DUPONT intended or that could reasonably have been foreseen by DUPONT.

140.    By manufacturing and selling Teflon® containing one or more defects or unreasonably dangerous conditions, and by failing to adequately warn against those defects and conditions, DUPONT has breached the implied warranty of merchantability.

## COUNT V

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR

## PARTICULAR PURPOSE UNDER OKLA. STAT. 12A, § 2-315

141.    Plaintiff, on their her and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 140 above as if fully set forth herein.

142.    As the manufacturer and seller of the Teflon® products, DUPONT had reason to know of the particular purpose, i.e., as a cookware coating, for which the Plaintiff and the Class Members use Teflon® cookware.  Further, DUPONT had reason to know that the Plaintiff and the Class Members would rely on and did rely on DUPONT's skill and judgment as product manufacturer, in selecting and furnishing Teflon® as a product suitable for use in cookware.  As such, as a matter of law, DUPONT warrants that its Teflon® product is fit for this purpose.

143.    As alleged herein, the Teflon® product manufactured and sold by DUPONT contained one or more defects and reasonably dangerous conditions which rendered Teflon® unfit for use as a cookware coating.  Teflon® as alleged herein, is a cookware coating product, which through normal use has the potential to expose consumers to toxic and harmful chemicals, particulates, and gases.  As such, DUPONT has breached the implied warranty of fitness for particular purpose.

## COUNT VI

## BREACH OF THE IMPLIED WARRANTIES

## UNDER OKL. ST. ANN. 12A § 2-318

144.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 143 above as if fully set forth herein.

145.    As alleged above, DUPONT has breached the implied warranty of marketability and the implied warranty of fitness for particular purpose.

146.    Plaintiff and Class Members purchased cookware coated with the Teflon® product manufactured and sold by DUPONT.

147.    As such, DUPONT is liable to the Plaintiff and Class Members for its breaches of implied warranties, not withstanding any lack of privity between DUPONT and Plaintiffs and the Class Members.

## COUNT VII

## STRICT LIABILITY

148.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 147 above as if fully set forth herein.

149.    The Teflon® manufactured by DUPONT was defective when it left the hands of DUPONT.

150.    The Teflon® is defective in that it is more dangerous than the ordinary user or consumer would expect.

151.   The defects made Teflon® unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

152.   Plaintiff and Class Members have purchased cookware containing the Teflon® product as a cooking surface coating. Teflon®, as alleged herein is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates and gases. As a direct and proximate result of the foregoing, the Plaintiff and Class Members have been damaged.

## COUNT VIII

## NEGLIGENCE

153.   Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 152 above as if fully set forth herein.

154.   DUPONT had a duty to the Plaintiff and Class Members to design Teflon® with reasonable care, to eliminate danger when used in a reasonably foreseeable manner and for its intended purpose.

155.   DUPONT further had a duty to consider the environment in which this product would be used, i.e. in the typical home kitchen as a cookware coating, and to consider the reasonably foreseeable risks attendant to that setting. DUPONT, as manufacturer, was in a superior position to consumers to ensure Teflon®'s safety by recognizing and curing defects.

156.   Defendant breached these duties by failing to exercise reasonable care to eliminate avoidable or foreseeable dangers as alleged herein, to the users of the Teflon® product in consumer cookware.

157.    Plaintiffs and Class Members have purchased cookware containing the Teflon® product as a cooking surface coating. Teflon®, as alleged herein is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates and gases. As a direct and proximate result of the foregoing, the Plaintiff and Class Members have been damaged.

**COUNT IX**

**BREACH OF DUTY TO WARN**

158.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 157 above as if fully set forth herein.

159.    DUPONT as manufacturer of the Teflon® product, had a duty to exercise reasonable care to prevent risk of injury to foreseeable users of cookware coated with Teflon®, a product that it knew or should have known is or can be dangerous. The exercise of reasonable care includes a duty to warn where, as here, a manufacturer such as DUPONT had reason to suspect the warning is necessary.

160.    DUPONT breached its duty by failing to exercise reasonable care to prevent risk of injury to the Plaintiff and Class Members, foreseeable users of the Teflon® product, which DUPONT knew or should have known to be dangerous, in consumers' cookware. DUPONT further breached its duty by failing to warn the Plaintiff and Class Members of the potential risks and dangers posed by Teflon®.

161.    Plaintiffs and Class Members have purchased cookware containing the Teflon® product as a cooking surface coating. Teflon®, as alleged herein is an unsafe cookware coating product, which through normal use can expose consumers to toxic and

harmful chemicals, particulates and gases.  As a direct and proximate result of the foregoing, the Plaintiff and Class Members have been damaged.

## COUNT X

## BREACH OF POST-SALE DUTY TO WARN

162.    Plaintiff, on her behalf and on behalf of the Class Members, realleges and reincorporates the allegations in paragraphs 1 through 161 above as if fully set forth herein.

163.    In the case of a product such as Teflon®, which was negligently designed as originally sold, DUPONT had a post-sale duty to take reasonable steps to warn of potential danger, which it knew, or should have known, in the exercise of reasonable care to exist.

164.    Plaintiff and the Class Members were purchasers of cookware containing the Teflon® product as a cooking surface coating.  DUPONT ordered no post-sale warnings to the Plaintiff or Class Members.  DUPONT therefore breached its post-sale duty to warn.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff, on behalf of herself and the Class of similarly situated consumers, demands judgment against DUPONT and seeks the following injunctive relief:

1. Requiring DUPONT to create a fund for ongoing medical monitoring of consumers who have purchased cooking products containing Teflon®;

2. Requiring DUPONT to create a fund for independent scientific researchers to further investigate the potential for adverse health effects to consumers who have used cooking products containing Teflon®;

3. Requiring DUPONT to provide a warning label on cooking products containing Teflon® regarding the potential adverse and harmful effects of using Teflon® coated cooking products;

4. Recision, restitution, and/or disgorgement remedies against DUPONT;

5. Actual damages; interests, costs, and attorneys' fees; and

6. Awarding such other and further relief as this court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury of all issues so triable as a matter of law.

Respectfully submitted,

Kenneth N. Jean OBA# 15094
Boettcher, Martin, Jean & Jackson
Post Office Drawer 1588
Ponca City, Oklahoma 74602
580-765-9967
580-765-5433 (fax)

Rhon E. Jones (JON093)
Beasley, Allen, Crow,
Methvin, Portis & Miles, P.C.
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103
334-269-2343
334-954-7555 (fax)